IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

THOMAS FULLER,
    Plaintiff,

v.

SUN LIFE ASSURANCE COMPANY
OF CANADA,
    Defendant.

Civil No. 1:23cv1241 (DJN)

**MEMORANDUM OPINION**

This matter comes before the Court following a multiyear dispute over Plaintiff Thomas

Fuller's eligibility for long-term disability benefits. Defendant Sun Life Assurance Company of

Canada distributed Fuller's disability benefits for twenty-four months, but on August 12, 2022,

Sun Life concluded that Fuller no longer suffered an ongoing disability as defined by his benefits

plan. After a year-long dispute that involved a half dozen physicians, dueling interpretations of

those physicians' opinions, and Sun Life's final administrative denial of Fuller's claims, this

civil action followed. The parties now move for final adjudication of their dispute. (ECF Nos.

36, 38). For the reasons that follow, the Court will GRANT Sun Life Judgment on the

Administrative Record and DENY Fuller Judgment on the Administrative Record.

## I.   BACKGROUND

Thomas Fuller is a fifty-five-year-old former employee of EMCOR Group, Inc., a

Connecticut-based construction company. (Administrative Record ("AR") (ECF No. 23) at

AR150–52). As an EMCOR employee, Fuller was covered by its Employee Welfare Plan

("EWP" or the "Policy"), which was established under the Employee Retirement Income

Security Act of 1974 ("ERISA"). (Complaint (ECF No. 1) at ¶¶ 4–5). Sun Life insured a

subcomponent of the EWP, EMCOR's Long-Term Disability ("LTD") Income Insurance, and EMCOR designated Sun Life as a fiduciary of the Policy and claims review administrator. (AR114). As claims review administrator, Sun Life wields "authority to make all final determinations" as to "eligibility for benefits," "the amount of any benefits due" and interpretation of "the terms of th[e] Policy." (AR144–45 (EWP § VII.B).

Fuller worked as a General Foreman for EMCOR, where his primary responsibilities involved supervising work crews. (AR150). The position "involve[d] a lot of walking" between and through construction sites and required the capacity to "lift heavy cabling and ladders." (AR113, AR151). On May 5, 2020, Fuller slipped on wet floor tiles in his kitchen and fell reeling to the ground. (AR445, AR534). His lumbar spine absorbed the shock of the impact, and by May 12, Dr. Deeni Bassam of the Spine Care Center — a treatment facility for back and neck injuries — diagnosed Fuller with a collapsed lumbar vertebra. (AR533–35). Approximately two months after his injury, Fuller underwent kyphoplasty to alleviate his pain.[1] (AR193). That treatment proved unsuccessful, and Fuller spent the next year and a half in physical therapy on Dr. Bassam's recommendation. (AR194–95; AR445). During that time, Fuller tried "epidurals, cortisone injections, and a nerve abla[t]ion" to assuage his discomfort, but to no avail. (*Id.*) Debilitating pain continued to radiate down Fuller's back, and Dr. Arjun Ramesh, also of the Spine Care Center, diagnosed Fuller with lumbar radiculopathy. (AR345).

Dr. Ramesh took over Fuller's treatment and recommended that he undergo lumbar interlaminar epidural steroid injections, which Dr. Ramesh administered across April and May

---

[1]    During a kyphoplasty, a doctor injects cement into damaged vertebrae for restorative purposes and to alleviate pain. *See* John Hopkins Medicine, Kyphoplasty (accessed June 28, 2024), https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/kyphoplasty [https://perma.cc/K98E-N9CX].

2022.[2] (AR316–321). Fuller received some respite from this treatment — following his last injection, he experienced "100% sustained relief" — but that relief abated over time. (*Id.*; *see also* AR330 (reporting initial success followed by a return of symptoms after earlier treatments)). By June 30, 2022, Fuller's pain had returned in full force, and Dr. Ramesh added complex regional pain syndrome ("CRPS") to Fuller's list of diagnoses. (AR329–30).

Meanwhile, Fuller's injuries rendered him unable to continue as a Foreman. He applied for LTD benefits, and Sun Life approved that application on May 14, 2020. (AR214). Under the terms of the EWP, an employee is disabled if he "is unable to perform the Material and Substantial Duties of his Own Occupation" "because of Injury or Sickness."[3] (AR124). But that definition of "disability" governs only for an employee's first 24 months of disability payments. After that point, employees stand subject to a stricter definition, which requires that an employee be "unable to perform with reasonably continuity any Gainful Occupation for which he is or becomes reasonably qualified" to remain eligible for benefits. (AR124–25). Fuller first received LTD benefits on August 12, 2020, rendering his final day under the laxer disability standard as August 11, 2022. (AR214).

On December 6, 2021, Sun Life informed Fuller that the stricter eligibility standard would soon apply, and it described the information necessary to sustain LTD benefits. (AR218–19). In anticipation of this change, on January 31, 2022, Sun Life prepared a Transferable Skills Analysis ("TSA") to identify alternate employment opportunities for Fuller. (AR245–48). The

---

[2]     In simple terms, this treatment involves injecting anti-inflammatory medicine into the space surrounding a patient's spinal nerves.

[3]     The "Material and Substantial Duties" of Fuller's occupation are "the essential tasks, functions, skills or responsibilities required by [EMCOR] for the performance of [Fuller's] Occupation," excluding those duties "that could be reasonably modified or omitted." (AR123).

TSA identified two occupations that Sun Life believed offered Fuller gainful employment commensurate with his experience, prior compensation and physical condition.[4]  (*Id.*)  The TSA based its conclusion on a medical review conducted nine months prior by a Sun Life consultant, Dr. Scott Strum.  (*Id.*; *see* AR152–57 (Dr. Strum's report)).  Fuller was not contacted during this process.  (AR245).

On June 2, 2022, Dr. Ramesh certified Fuller to return to work on permanent light duty status, subject to several physical limitations.  (AR307–10).  Fuller adamantly disagreed with that assessment, so he called Sun Life to explain why his various handicaps prevented him from working.  (AR322–24).  Dr. Ramesh agreed that Fuller's mobility was severely limited:  in Dr. Ramesh's judgment, as of July 12, Fuller could stand for no more than five minutes and sit for no more than one hour continuously, and stand for less than two hours and sit for about two hours in an eight-hour workday.  (AR345–48 (the "July 12 Statement")).  Nevertheless, Dr. Ramesh concluded that Fuller could return to work.  (AR331–334).

Sun Life sent Fuller's records to Dr. William Barreto, a physician with the National Medical Evaluation Services, for an independent review.  (AR386–90).  On August 26, 2022, Dr. Barreto opined that Fuller could return to full-time work subject to the limitations articulated by Dr. Ramesh.  (*Id.*)  Dr. Barreto based his judgment exclusively on a review of the cold record; Dr. Baretto did not contact Fuller, and he did not consult with Dr. Ramesh, as Dr. Ramesh's staff ostensibly claimed that he would not conduct a telephonic peer-to-peer review.[5]  (*Id.*)  On August 31, relying on Dr. Baretto's findings, Sun Life issued another TSA.  That second TSA

---

[4]      The January 2022 TSA identified four occupations compatible with Fuller's physical limitations, but two of these positions did not satisfy Sun Life's calculation of Fuller's gainful wage.  (AR245–48).

[5]      Fuller disputes the veracity of Dr. Ramesh unwillingness to consult telephonically.

4

adhered to Sun Life's prior conclusions and identified three occupations where Fuller could be gainfully employed. (AR394–95). Armed with Dr. Barreto's report and the updated TSA, Sun Life notified Fuller on September 12 that, as of August 12, 2022, he no longer satisfied the LTD criteria. (AR396–400).

Fuller appealed Sun Life's denial of coverage by a letter dated February 26, 2023. (AR581–86). In his appeal, Fuller asserted that Sun Life failed to account for Dr. Ramesh's July 12 Statement, disputed that Dr. Ramesh was unwilling to consult with Dr. Barreto, and explained that his enervating pain rendered him "unable to perform the[] tasks" that Sun Life found him competent to perform. (*Id.*) To assuage these concerns, Sun Life inaugurated a second independent review of Fuller's file, which was completed by Dr. Arlen Green on April 18, 2023. (AR406–11). This review broke no new ground. Dr. Green judged that there was "no evidence" that Fuller was "incapable of performing full-time sedentary work activities [as of] August 12, 2022." (*Id.*)

Dr. Green's findings prompted Fuller to retain counsel. (AR643–44). Through counsel, Fuller pressed for additional time to refute Dr. Green's findings, and on August 1, 2023, Fuller supplemented his appeal with a new tranche of documents, including a September 20, 2020, report from Dr. Sohail Mirza (AR537–43); a June 28, 2023 Functional Capacity Evaluation ("FCE") (AR443–55); and a spate of additional records from Dr. Ramesh. (AR460–535). In response, Sun Life commenced a third — and final — independent medical review. The same result obtained. On August 16, 2023, Dr. Andrew Nava, like Dr. Baretto and Dr. Green before him, concluded that Fuller was "[]capable of performing full-time . . . sedentary [w]ork." (AR545, AR547). Sun Life compiled an addendum to its TSA from the prior year, pointing out the same three occupations as it had in August 2022. (AR1201–02).

5

Fuller, through counsel, wrote Sun Life on August 30 to express his "disappoint[ment] and concern[]" regarding Sun Life's use of Dr. Nava's report, which Fuller believed was "deficient," because Dr. Nava failed to review Dr. Ramesh's July 12 Statement and "misinterpret[ed]" the results of Fuller's FCE, and because, in Fuller's view, Dr. Nava's competence was suspect. (AR557–60). Fuller stridently flagged Dr. Nava's "shady track record" and "incompetence," as evinced by a compendium of negative online patient reviews. (*Id.*) The letter concluded with a series of questions that Fuller demanded Sun Life answer within the next approximately two weeks. (AR564–65). Sun Life required only two days. On September 1, 2023, Sun Life delivered its final denial of Fuller's LTD benefits. (AR1209–1220).

Thirteen days later, on September 14, 2023, Fuller sued. (Complaint (ECF No. 1)). Four rounds of briefing followed. First, at the parties' request, the Court directed an initial round of briefing on the applicable standard of review. (ECF Nos. 13, 14). The parties then filed cross motions for summary judgment (ECF No. 26) and judgment on the administrative record (ECF No. 28). Upon review of the parties' arguments, the Court ordered supplemental briefing on the interpretation of a Connecticut statute of particular import to this case. (ECF No. 38). The parties dutifully complied, and briefing concluded on July 17, 2024, rendering this matter ripe for disposition. (*Id.*)

## II.    LEGAL STANDARD

### A.    Rules 52 and 56

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). That requires the evidence to be "so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Once the movant has met its burden, the nonmovant must then demonstrate

with specific evidence that there exists a genuinely disputed issue of material fact. *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. Because a court "cannot weigh the evidence or make credibility determinations" in a Rule 56 posture, *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 569 (4th Cir. 2015), all "justifiable inferences are to be drawn in the [nonmovant's] favor." *Anderson*, 477 U.S. at 255. However, the nonmovant "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

The Fourth Circuit has long expressed "reservations" regarding the use of "the summary judgment standard . . . in[] the ERISA context." *Phelps v. C.T. Enters., Inc.*, 394 F.3d 213, 218 (4th Cir. 2005). These reservations stem from the Fourth Circuit's recognition that "disputed issues of fact" often surround the "ultimate conclusion" to award or deny benefits. *Tekmen v. Reliance Standard Life Ins. Co.*, 55 F.4th 951, 960 (4th Cir. 2022). Such disputes cannot be resolved properly within the confines of Rule 56. Instead, a court may conduct a "Rule 52 bench trial . . . limited to the administrative record that was before the plan administrator." *Id.* at 961.

Sun Life argues that Rule 56 constitutes the proper vehicle for the parties' cross-motions, because "there are no material facts in dispute in this case." (Def.'s Opp. (ECF No. 33) at 3). In a narrow sense, Sun Life stands correct: the parties do not contest any of the historical facts. But those are not the only types of factual disputes that can preclude summary judgment. When "the parties [do] not contradict one another's proffered facts, but only dispute[] the inferences that a fact finder would draw from those underlying facts," that conflict suffices to create a triable issue for the factfinder. *Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Etrangers a Monaco*, 329 F.3d 359, 362 (4th Cir. 2003). And here, the parties vigorously contest

7

the factual inferences that should be drawn from the record. Thus, with the consent of the

parties, the Court will try this case on the administrative record under Rule 52.[6]

## B. ERISA

The Employment Retirement Income Security Act of 1974, Pub. L. No. 93-406, 88 Stat.

829, 29 U.S.C. §§ 1001 *et. seq.*, constitutes a "comprehensive and reticulated statute" that

establishes minimum federal standards for employee welfare benefit plans. *Nachman Corp. v.*

*Pension Ben. Guar. Corp.*, 446 U.S. 359, 361 (1980). Congress enacted ERISA to protect the

"well-being and security of millions of employees and their dependents" by mandating that

"disclosure be made and safeguards be provided" for employee welfare benefit plans. 29 U.S.C.

§ 1001(a). An employee welfare benefit plan is one that is "maintained by an employer . . . for

the purpose of providing for its participants or their beneficiaries, through the purchase of

insurance or otherwise . . . benefits in the event of sickness, accident, disability, death or

unemployment[.]" *Id.* § 1002(1). Plans are typically sponsored by an employer or group of

employers and administered by the employer or by a manager — often, an insurance company

that underwrites the plan — of the employer's choosing. *Id.* § 1002(16). The plan administrator

constitutes a fiduciary under ERISA. *Id.* §§ 1002(21)(A), 1102(a).

Because an employer or insurance company will often administer the plan, the

administrator will "both determine[] whether an employee is eligible for benefits and pay[]

benefits out of its own pocket." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). These

dual roles foster a conflict between an administrator's pecuniary interest and the fair and

impartial adjudication of benefits claims. *Id.*; *see Halperin v. Richards*, 7 F.4th 534, 542, 547

---

[6]     In its brief, Sun Life asks the Court to treat its motion as arising under Rule 52 should the
Court disagree that summary judgment is appropriate. (Def.'s Opp. at 3). The Court grants that
request.

(7th Cir. 2021) (noting that "ERISA invites conflicts of interest" that "have for decades challenged ERISA plans and courts trying to implement ERISA faithfully").  Congress addressed this problem by imposing strict fiduciary duties of loyalty and care on plan administrators.  Section 403 mandates that assets "be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1103(c)(1).  Section 404 requires plan administrators to act "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of providing benefits to participations and their beneficiaries" while defraying administrative cost.  *Id.* § 1104(a)(1).  And neighboring language specifies that an administrator must exercise "the care, skill, prudence, and diligence . . . that a prudent man . . . would use."  *Id.* § 1004(a)(1)(B).  Together, these fiduciary obligations are "the highest known to the law." *Tatum v. RJR Pension Inv. Comm.*, 761 F.3d 346, 356 (4th Cir. 2014) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)).

ERISA administrators must provide a neutral, "full and fair review" of any denial of benefits.  29 U.S.C. § 1133(2).  This procedural safeguard helps "protect a plan participant from arbitrary or unprincipled decision-making." *Weaver v. Phoenix Home Life Mut. Ins. Co.*, 990 F.2d 154, 157 (4th Cir. 1993).  But should it prove insufficient, Congress also created a private right of action for covered employees to obtain judicial review of a denial of benefits.  29 U.S.C. § 1132(a)(1)(B).

ERISA does not expressly prescribe any standard of review for denial-of-benefits actions, but the Supreme Court has long held that "established principles of trust law" require *de novo* review "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber*

9

*Co. v. Bruch*, 489 U.S. 101, 115 (1989).  Under *de novo* review, a district court independently

reviews "the often-voluminous administrative record" and may "assess[] credibility and

determin[e] the appropriate weight to assign evidence" to "determine whether the claimant was

entitled to benefits." *Tekmen*, 55 F.4th at 961.  On the other hand, if a benefit plan vests

discretion in the administrator, then a court reviews the claimant's denial of benefits for abuse of

discretion. *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 321 (4th Cir. 2008).

Abuse of discretion review requires a court to defer to a plan administrator's reasonable

determinations. *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 629–30 (4th Cir. 2010).  A

reasonable decision results from "a deliberate, principled reasoning process" and is "supported

by substantial evidence." *Id.* (internal quotations omitted).  The term "substantial evidence"

refers to "evidence which a reasoning mind would accept as sufficient to support a particular

conclusion." *DuPerry v. Life Ins. Co. of N. Am.*, 632 F.3d 860, 869 (4th Cir. 2011).  In assessing

an administrator's reasonableness, a court cannot "re-weigh[] the evidence itself" or "substitute

[its] own judgment in place of the judgment of the plan administrator." *Evans*, 514 F.3d at 325;

*Williams*, 609 F.3d at 630.[7]

---

[7]     In deciding whether an administrator's determinations are reasonable, the Fourth Circuit
has instructed courts to consider "(1) the language of the plan; (2) the purposes and goals of the
plan; (3) the adequacy of the materials considered to make the decision and the degree to which
they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in
the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was
reasoned and principled; (6) whether the decision was consistent with the procedural and
substantive requirements of ERISA; (7) any external standard relevant to the exercise of
discretion; and (8) the fiduciary's motives and any conflict of interest it may have." *Booth v.
Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342–43 (4th Cir. 2000).
The *Booth* factors are "nonexclusive" and meant to "guide [] abuse-of-discretion review."
*Williams*, 609 F.3d at 630.

## III.   ANALYSIS

### A.   The Standard of Review

Whether a plan "confer[s] discretionary authority on the plan administrator to make a

benefits-eligibility determination" is determined by a court "*de novo*" using ordinary principles

of contract interpretation. *Blackshear v. Reliance Standard Life Ins. Co.*, 509 F.3d 634, 638–39

(4th Cir. 2007).  Here, the Employee Welfare Plan unambiguously vests discretionary authority

in Sun Life by stating that Sun Life holds "discretionary authority" to "determin[e] [] eligibility

for benefits . . . the amount of any benefits due, and to construe the terms of the Policy."

(AR144–45).  The EWP further specifies that Sun Life's discretionary decisions shall be

judicially upheld "unless the claimant provides that Sun Life's determinations are arbitrary and

capricious."  (*Id.*)  Both parties agree that this language contemplates abuse-of-discretion review.

(Pl. SOR Br. (ECF No. 22) at 3); (Def.'s SOR Br. (ECF No. 24) at 2).

The EWP's language, however, does not suffice to determine the applicable standard.

The Policy contains a choice-of-law clause subjecting it to Connecticut law.  (AR114).[8]  On

January 1, 2020, Connecticut enacted Conn. Gen. Stat. § 38a-472k, which prohibits any insurer

---

[8]      Choice of law clauses are not self-executing.  In federal question cases, district courts
"apply federal, not forum state, choice of law rules."  *In re Lindsay*, 59 F.3d 942, 948 (9th Cir.
1995); *see Edelmann v. Chase Manhattan Bank, N.A.*, 861 F.2d 1291, 1294 & n.14 (1st Cir.
1988) (collecting cases).  In the context of ERISA, at least four Circuits enforce choice of law
clauses so long as they are "not unreasonable or fundamentally unfair," or some slight variation
thereof. *Brake v. Hutchinson Tech. Inc. Group Disability Income Ins. Plan*, 774 F.3d 1193 (8th
Cir. 2014); *Wang Labs., Inc. v. Kagan*, 990 F.2d 1126, 1128–29 (9th Cir. 1993); *Ellis v. Liberty
Life Assurance Co. of Boston*, 958 F.3d 1271, 1288 (10th Cir. 2020) (adopting an even stronger
presumption of enforceability); *Buce v. Allianz Life Ins. Co.*, 247 F.3d 1133, 1149 (11th Cir.
2001); *but see DaimlerChrysler v. Durden*, 448 F.3d 918, 922 (6th Cir. 2006) (adopting the
Restatement (Second) of Conflicts of Law § 187 (Am. L. Inst. 1987)).  *Cf.* William Baude,
*Beyond DOMA: Choice of State Law in Federal Statutes*, 64 Stan. L. Rev. 1371, 1419 (2012)
(criticizing *DaimlerChrysler* and arguing that ERISA requires courts to follow choice-of-law
clauses housed in plan documents).  No party argues against the application of Connecticut's
law, and the Court finds any contrary contention to be waived.

"or other entity delivering, issuing for delivery, renewing, amending, or continuing" "disability income protection coverage" from including "in such policy a provision reserving discretion to such insurer . . . to interpret the terms of such policy, or provide standards for the interpretation or review of such policy, that are inconsistent with the laws of this state." Conn. Gen. Stat. §§ 38a-369, 38a-472k. Fuller contends that this law prohibits discretionary clauses in insurance policies after January 1, 2020, and that the EWP — though issued before this date — was "continu[ed]" by Sun Life on January 1, 2021, and every year thereafter, thereby bringing the Policy within prohibition's scope. Sun Life counters that application of the statute to its Policy would be retroactive; that such retroactivity would violate the Constitution's Contract Clause; and that, in any event, Fuller has failed to show that § 38a-472k prohibits the type of delegation here. The Court resolves first whether § 38a-472k applies to the Policy and then turns to what effect § 38a-472k has on the Policy. In brief, the Court finds that § 38a-472k by its terms applies to the EWP; that the statute may permissibly do so consistent with the Contract Clause; and that, properly construed, § 38a-472k compels *de novo* review of Sun Life's benefits determination.

### 1.    Section 38a-472k's Applicability

Section 38a-472k does not apply to preexisting contracts of its own force. An insurer must "deliver[], issu[e] for delivery, renew[], amend[], or continu[e]" their policy before being subject to the statute. In other words, some affirmative act must occur to trigger the law. EMCOR first subscribed to Sun Life's EWP on January 1, 2014, with those terms amended on July 1, 2019. (AR114). The Policy was therefore not "delivered," "issued for delivery" or "amended" after January 1, 2020. The Court therefore considers whether the EWP was "renewed" after the effective date. After finding that it was not, the Court nevertheless applies

12

the statute, because Sun Life concedes that its Policy was "continued" after the statute's effective date.

Connecticut law defines "renewal" for other types of insurance policies as "the issuance and delivery by an insurer of a policy replacing at the end of the policy period a policy previously issued and delivered by the same insurer, or the issuance and delivery of a certificate or notice extending the term of the policy beyond its policy period or term." Conn. Gen. Stat. § 38a-341(2). Although this definition was not incorporated into § 38a-472k, the two statutes are *in pari materia* — they employ the same "statutory term" covering "the same subject matter" — and thus § 38a-341(2) may "be looked to for guidance in reaching an understanding of the meaning of" renew. *State v. Pommer*, 955 A.2d 637, 624 (Conn. App. Ct. 2008) (quoting R. Williams Jr., *Statutory Construction in Connecticut: An Overview and Analysis*, 62 Conn. B.J. 313–14 (1988)). The presumption of semantic consistency provides the applicable test.

Applying the foregoing definition, the Court finds that the EWP was not "renewed." The EWP contains no fixed end date, and the Policy sets an annual anniversary date of January 1, 2021. (AR114). On each anniversary, Sun Life has unfettered discretion to terminate the Policy or any benefits provision by giving sixty days' written notice to EMCOR. (AR140–41). But acquiescence to the present terms of the bargain does not constitute a renewal of the bargain. No new policy is "issued" or "delivered," nor is anything "extend[ed]." Conn. Gen. Stat. § 38a-341(2). As another district court has explained in interpreting similar language, an "anniversary date . . . evidences an intent for the Policy to continue indefinitely" and is not "a renewal date." *Arrington v. Sun Life Assurance Co. of Canada*, 2019 WL 2571160, at *5 (D. Md. June 21, 2019).

Fuller's only other textual hook constitutes the "continuing" language in § 38a-472k. He argues that Sun Life's choice not to rescind the EWP on each anniversary date marked a continuance of the Policy.[9] Sun Life does not dispute that its Policy anniversaries continued the Policy. Instead, it argues that the Court should infer an exception into the statutory text, such that the law does not apply to a contract executed pre-enactment. Because Sun Life "fails to counter" Fuller's claim that it continued the Policy, the Court treats the issue "as conceded." *Williams v. Newport News Sch. Bd.*, 2021 WL 3674983, at \*17 (E.D. Va. Aug. 19, 2021); *see also Ruddy v. Bluestream Prof'l Serv., LLC*, 444 F. Supp. 3d 697, 714 n.34 (E.D. Va. 2020) (same). The Court thus finds that the statute applies.

### a.    Sun Life's Case Law

Sun Life offers a smattering of district court decisions that, it claims, support reading a non-retroactivity principle into the statutory discretionary ban. Sun Life's cases fail to persuade.

For instance, one court interpreting a Minnesota anti-delegation statute held that it did not apply to a policy issued six years before the effective date of the statute, despite the disability occurring post-enactment. *Whitesell v. Liberty Life Assurance Co. of Bos.*, 650 F. Supp. 3d 832, 837 (N.D. Cal. 2022). But by its plain terms, the statute covered only those "policies issued or renewed on or after" the effective date, and the plaintiff did not argue that either event occurred. *Id.* Unsurprisingly, the court held that Minnesota's law did not apply.

---

[9]    Section 38a-472k does not define its list of verbs, nor have there been any state court expositions of the "continuing" language. This Court has discovered only one other area of Connecticut insurance law that describes a policy continuance, but it too remains undefined and uninterpreted. Conn. Gen. Stat. § 38a-591a(21)(A). However, California enacted a similar discretionary policy ban that applies to all disability insurance policies "offered, issued, delivered, or renewed." Cal. Ins. Code § 10110.6(a). The law goes on to define renewal as a "continu[ance] . . . on or after the policy's anniversary date," supporting Fuller's reading of the law here. *Id.* § (b).

A similar theory was rejected in *Hollingshead v. Stanley Works Long Term Disability Plan*, 2012 WL 959402 (D. Colo. Mar. 21, 2012). There, a claimant argued that application of a Colorado statute to a pre-enactment benefits plan would not be retroactive, because his claim was filed and denied after the statute's effective date. *Id.* at *2. The claimant "cite[d] no authority for his assertion," and the court flatly rejected it. *Id.*

Sun Life next points to a collection of cases from the District of Connecticut that Sun Life claims have "continued to enforce discretionary clauses . . . where the operative insurance contract was placed in effect before January 1, 2020." (Def.'s SOR Br. at 8). But that reading paints an incomplete picture. First, each of the three cases that Sun Life cites involved benefits claimed before § 38a-472k's effective date and litigants who did not contest the standard of review.[10] Second, on the Court's reading, § 38a-472k does not apply retroactively to *all* disability income insurance contracts; only an event after January 1, 2020 — delivery, issuance for delivery, renewal, amendment or continuance — brings policies within the statute's scope. Third, none of Sun Life's cases even cite § 38a-472k, likely because none of the plaintiffs had a colorable claim that the law's discretionary ban applied to their dispute. This flimsy caselaw fails to persuade the Court.

Every other authority that Sun Life cites cuts against its own position. In the first, *Arrington v. Sun Life Assurance Co. of Canada*, a claimant argued that "a Policy anniversary

---

[10]     *See Nall v. Hartford Life & Accident Ins. Co.*, 2021 WL 10352744, at *6–7 (D. Conn. Dec. 8, 2021) (2019 disability where the "parties d[id] not dispute" the insurer's discretionary authority), *aff'd*, 2023 WL 2530456 (2d Cir. Mar. 16, 2023); *Lewis v. First Unum Life Ins. Co. of Am.*, 2023 WL 2687284, at *2–3, *29 n.7 (D. Conn. Mar. 29, 2023) (2018 disability where the parties "stipulated that the abuse of discretion standard of review applies") (internal quotations omitted); *Neufeld v. Cigna Health & Life Ins. Co.*, 2023 WL 4366137, at *5–6 (D. Conn. July 6, 2023) (putative class action where the class conceded the validity of discretionary clauses and disputed only how those clauses were affected by alleged violations of a Department of Labor regulation).

date constitutes the equivalent of a renewal date under Maryland law." 2019 WL 2571160, at *5. The court concluded otherwise, but in so doing, it explained that the policy's language "evidences an intent for the Policy to *continue*" not "renew[]." *Id.* (emphasis added). In other words, *Arrington* would treat acquiescence to a policy on its anniversary date as a continuance; Maryland's substantive law simply omitted continuances from its list of qualifying events.

In Sun Life's second case, *Zaccone v. Standard Life Ins. Co.*, the district court held that Illinois' discretionary ban "does not apply retroactively to ERISA plans established before the regulation's effective date." 2013 WL 1849515, at *5 (N.D. Ill. May 1, 2013). But the court went on to note that the ban could and did permissibly sweep in any policies "renewed after . . . the provision's effective date," with the act of renewal "incorporat[ing] by operation of law" the "ban on discretional clauses . . . into the Plan." *Id.* at *5–6.

And in Sun Life's final case, *DeCristofaro v. Life Ins. Co. of N. Am.*, the district court concluded that a law rendering discretionary language "void and unenforceable" "applies to 'existing' policies, not simply those issued after [the law's] passage, which renders its retroactive application intentional." 605 F. Supp. 3d 337, 342–43 (D.R.I. 2022). Indeed, *DeCristofaro* went on to reject the reasoning of *Whitesell* and *Hollingshead* and separately rely on the "onset of [plaintiff's] disability, the claim for benefits, and the termination" of benefits as dates relevant to the reach of the statutory ban. *Id.* at 344.

In sum, none of Sun Life's authority stands for the proposition that its Policy must be exempted from Conn. Gen. Stat. § 38a-472k. The Court declines to recognize such an exemption.

16

**b.    The Contract Clause**

Sun Life next argues that § 38a-472k violates the Contract Clause. That Clause provides that "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts[.]" U.S. Const. art. I, § 10, cl. 1. The Contract Clause was crafted to provide a "bulwark in favor of . . . private rights" by preventing retroactive impairments of contract, thereby "giv[ing] a regular course to the business of society." The Federalist No. 44 (Madison). It enumerated "a great principle, that contracts should be inviolable." *Sturges v. Crowninshield*, 17 U.S. (4 Wheat) 122, 205–06 (1819).

But the Contract Clause's sweeping language has never been read in absolutes.[11] The Supreme Court has long held that the Clause prohibited only retroactive impairments of contracts. *Ogden v. Saunders*, 25 U.S. (12 Wheat) 213, 262, 286, 327 (opinions of Washington and Trimble, JJ.); *accord Edward v. Kearzey*, 96 U.S. 595, 603 (1877). Moreover, the Clause leaves room for exercise of the state's traditional police power over health, safety and morals. *Stone v. Mississippi*, 101 U.S. 814, 817–19 (1880).

Early in the Nation's history, the Supreme Court applied the Contracts Clause by distinguishing "the obligation of a contract" from remedies "to enforce that obligation," *Sturges v. Crowninshield*, 17 U.S. (4 Wheat.) 122, 200 (1819), with the latter subject to legislative change so long as "alterations of the remedy" did not "impair the right." *Bronson v. Kinzie*, 42 U.S. (1 How.) 311, 317 (1843). With time, however, this distinction proved "obscure," *W.B. Worthen Co. v. Kavanaugh*, 295 U.S. 56, 60 (1935), and eventually, the Supreme Court

---

[11]   *See, e.g., Ogden*, 25 U.S. (12 Wheat) at 286 (Washington, J.) (explaining that the Contract Clause cannot be read to "assign[] to contracts, universally, a literal purport, and to exact from them a rigid literal fulfilment"); *W.B. Worthen Co. v. Thomas*, 292 U.S. 426, 433 (1934) (warning against "literalism in the construction of the contract clause").

abandoned the "remedy/obligation distinction" in favor of a "reasonable[ness]" inquiry focused on "the legitimate expectations of the contracting parties." *U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 19 n.17 (1977). This inquiry has crystalized into a two-part test. First, has "the state law . . . operated as a substantial impairment on a contractual relationship[?]" *Sveen v. Melin*, 584 U.S. 811, 819 (2018) (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978)). Second, if the impairment is substantial, does it nevertheless constitute a permissible exercise of the state's police power? *Manigault v. Springs*, 199 U.S. 473, 480–81 (1905). The police power exception requires "a significant and legitimate public purpose behind the" substantial impairment, as opposed to "a benefit to special interests." *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411–12 (1983). If a state has a significant public purpose — and if the state is not itself a party to the contract — then a court applies means-end scrutiny, with deference "to legislative judgment as to the necessity and reasonableness of a particular measure." *Id.* at 412–13.

### i.    Step One: Substantial Impairment

Section 38a-472k impairs Sun Life's contractual relations, but that impairment lacks the substance required to violate the Contract Clause. Contractual obligations include "the contemporaneous state law pertaining to interpretation." *U.S. Tr. Co. of N.Y.*, 431 U.S. at 19 n.17; *see also Von Hoffman v. City of Quincy*, 71 U.S. (4 Wall.) 535, 550 (1866) (explaining that "laws which subsist at the time and place of the making of a contract" inhere in the contract). Thus, by rescinding Sun Life's interpretative and performance discretion, the Connecticut legislature impaired contractual obligations. But Sun Life fails to bridge the gulf between a scant and substantial impairment. In assessing the substantiality of an impairment, courts must consider "the extent to which the law undermines the contractual bargain, interferes with a

18

party's reasonable expectations, and prevents the party from safeguarding or reinstating his rights." *Sveen v. Melin*, 584 U.S. 811, 819 (2018).  Sun Life claims that application of § 38a-472k would kneecap "a material benefit of the bargain," "impair [its] reasonable expectation and deprive it [] of any means to safeguard or reinstate its rights." (Def's SOR Br. at 4–5).  The Court disagrees.

The essence of the EWP's bargain is simple:  Sun Life conveys insurance in exchange for periodic premium payment from EMCOR.  That basic bargain survives § 38a-472k's operation.  True, expectations of future benefits payouts undeniably color the bargained for premium price.  But *every* piece of legislation affecting a prior contract may have altered the price term had the change in law been known at the time of contracting.  Were that sufficient to satisfy substantial impairment, then any private contract could "estop the legislature from enacting laws." *Manigault*, 199 U.S. at 480.  And the impact on Sun Life's pecuniary interests should be marginal.  After all, ERISA's duty of loyalty means that fiduciaries may not subordinate beneficiaries' interests to their own.  So, if Sun Life is providing a "full and fair review" with an eye exclusively towards "the interest of the participants and beneficiaries," then the gap between its determinations and those of a court reviewing its determinations *de novo* should not be extreme.  29 U.S.C. §§ 1133(2), 1104(a)(1).

For a similar reason, Sun Life's reasonable expectations are not meaningfully undermined.  The crux of the contract has not been altered.  Legislative tinkering around the edges is consonant with Sun Life's legitimate future expectations, as parties are presumed to be aware "that state law will [not] remain entirely static." *U.S. Tr. Co. of N.Y.*, 431 U.S. at 19 n.17; *see Spannaus*, 438 U.S. at 245 ("[m]inimal alteration of contractual obligations may end the inquiry at its first stage.").  That is particularly true here.  More than half of the states have

19

enacted discretionary policy bans. *See Davis v. Unum Life Ins. Co. of Am.*, 2016 WL 1118258, at *3 (E.D. Ark. Mar. 22, 2016) (tallying twenty-five states as of 2015). Sun Life — a sophisticated commercial actor well versed in national insurance tends — cannot credibly plead ignorance of this trend.

Finally, any damage to Sun Life's rights was easily remedied. The EWP provided for policy anniversaries allowing Sun Life to repudiate the agreement, increase premiums, or simply adopt the laws of a more favorable jurisdiction. Sun Life chose not to take any of those remedial measures. That fact drives home that Sun Life's rights have not been substantially impaired.

### ii.    Step Two: The Permissibility of the Impairment

Even if Sun Life could surmount the step one barrier — and it cannot — the Court would reject its claims at step two. A substantial legislative impairment to contractual obligations stands congruent with the Contract Clause when the law "is drawn in an appropriate and reasonable way to advance a significant and legitimate public purpose." *Sveen*, 584 U.S. at 812 (internal quotations omitted). Sun Life offers a solitary and conclusory sentence that § 38a-472k does not advance "a significant or legitimate public policy or purpose" because "the statute impacts a legal standard of review." (Def.'s SOR Br. at 7). That argument is indefensible.

Courts must "defer to legislative judgments as to the necessity and reasonableness of a particular measure." *U.S. Tr. Co. of N.Y.*, 431 U.S. at 23. Overcoming this deference constitutes a tall burden, and appropriately so. Federal courts do not serve as councils of revision, roving the statute book for laws that they deem unwise. Unless a state "impose[s] a drastic impairment when an evident and more moderate course would serve its purposes equally well," or acts unreasonably "in light of the surrounding circumstances," it stands beyond the judicial ken to pass on the wisdom of legislative policy choices. *Id.* at 31.

ERISA was enacted on the heels of a decade's long congressional investigation into plan fiduciaries who "subordinated the interests of participants to their own interests or to those of the employing company." *Private Welfare and Pension Plan Legislation: Hearings on H.R. 1045, H.R. 1046, and H.R. 16462 Before the Gen. Subcomm. on Lab. of the H. Comm. on Educ. and Lab.*, 91st Cong. 470–72 (1973) (statement of George P. Shultz, Sec'y of Lab.). Congress took square aim at this "arbitrary [and] unprincipled decision-making" by mandating dispassionate claims adjudication by plan fiduciaries. *Weaver*, 990 F.2d at 157. And to ensure compliance with these statutory duties, Congress enacted a judicial backstop. 29 U.S.C. § 1132(a)(1)(B). Yet, as one circuit has candidly put it, "[t]he very existence of 'rights' under [ERISA] depends on the degree of discretion lodged in the administrator. The broader the discretion, the less solid an entitlement the employee has." *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 331 (7th Cir. 2000).

In response, at least half of the states have enacted some form of ban or limitation on deferential standards of review in employee welfare plans. *See Davis*, 2016 WL 1118258, at *3 (E.D. Ark. Mar. 22, 2016). These laws plainly target a legitimate public purpose; indeed, they go to the very heart of ERISA: "ensur[ing] that employees [] receive the benefits they ha[ve] earned." *Conkright v. Frommert*, 559 U.S. 506, 516 (2010).

For much the same reason, the Court concludes that § 38a-472k constitutes a reasonable and appropriate measure to advance Connecticut's legitimate purpose. Section 38a-472k was designed to "deal with a broad, generalized economic or social problem." *Spannaus*, 438 U.S. at 250. It applies equally to all insurers within the state and for the purpose of protecting all covered employees, not a favored and narrow special interest group. *Exxon Corp. v. Eagerton*, 462 U.S. 176, 191–92 (1983) (listing these as relevant factors). The insurance industry has

21

"historically been subject to heavy regulation." *Id.* at 194 n.14; *see also Spannaus*, 438 U.S. at 250 (noting the law affected "an area already subject to state regulation"). And as explained above, Sun Life's contractual impairment is quite narrow. *See U.S. Tr. Co. of N.Y.*, 431 U.S. at 27 (the "extent of impairment is certainly a relevant factor in determining its reasonableness."). In many respects, the legislature simply placed Sun Life on equally footing with every other contracting party in the state. Whereas the *contra proferentem* canon would require a court to construe ambiguous term against the drafter, discretionary clauses flip the script and require judicial deference to the drafter's interpretations of its own terms. And while standard form insurance contracts are the quintessential contract of adhesion[12] — which would "sometimes [] allow[] policyholders to obtain coverage despite their failure to comply strictly with the terms of their policy" — discretionary clauses often deny coverage even when a court's independent judgment would lead it to find that a beneficiary stands entitled to benefits. *Sonson v. United Servs. Auto. Ass'n*, 100 A.3d 1, 2 (Conn. App. Ct. 2014). Sun Life cannot credibly claim that it is unreasonable to subject it to the ordinary rules of contract.

Sun Life tries to resist to this conclusion by narrowing its focus to the "continuing" language in § 38a-472k. It notes that this phrase appears in no other state prohibition on delegation, and therefore that Connecticut's ban stands as the only law that may "apply[] retroactively to reform already existing contracts." (Def.'s SOR Br. at 7); *but see supra* § II.A.1. n. 9 (explaining that the most populous state applies its discretionary ban in precisely the same manner as Connecticut). This retroactively, Sun Life contends, renders the law unreasonable,

---

[12]    The term "contract of adhesion" was first coined to describe insurance contracts, like Sun Life's, wherein "[t]he contract is drawn up by the insurer and the insured . . . merely 'adheres' to it [and] has little choice as to its terms." Edwin W. Patterson, *The Delivery of a Life-Insurance Policy*, 33 Harv. L. Rev. 198, 222 (1919).

even if the General Assembly could have a permissible purpose in applying the law prospectively. But Sun Life's own Policy shows why this would be folly. Its Policy, like many employee welfare plans, continues in perpetuity until Sun Life chooses to abandon the Policy or the employer no longer satisfies the terms of the contract. Thus, few beneficiaries would receive the protections afforded by the legislature unless the statute drew existing policies into its grasp.

Because Sun Life has shown neither a substantial contractual impairment nor that any impairment fails means-end scrutiny, the Contract Clause cannot prevent § 38a-472k's application to its Policy.

### c.   Fuller's Pleadings

Sun Life raises one final challenge to § 38a-472k's application. According to Sun Life, Fuller's interpretation of § 38a-472k "is inconsistent with his pleading," because Fuller alleges that Sun Life was acting as a fiduciary, which *ipso facto* requires deferential review. (Def.'s SOR Br. at 8 (citing Compl. ¶¶ 8, 11–13)). That conclusion does not follow from its premise. The standard of review applied by this Court does not alter whether Sun Life constitutes a fiduciary. Under ERISA, "a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or . . . its assets, . . . or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). From this language, Sun Life draws the mistaken proposition that *de novo* review vitiates any discretion Sun Life has under the Policy, thus stripping it of fiduciary status. But a court's independent review of a fiduciary's actions does not negate the discretionary authority that the fiduciary has in plan administration. Indeed, the entire premise of *Firestone* — which for the first time set forth the ERISA standard of review — was that designation as a fiduciary does not bring with it discretionary judicial

23

review. 489 U.S. at 113. Speaking for a unanimous Court, Justice O'Connor explained that ERISA does not "characterize a fiduciary as one who exercises *entirely* discretionary authority or control" but as one who exercises "*any* discretionary authority or control," and thus *de novo* review and fiduciary status are consonant. *Id.* (emphasis in original).

*      *      *

Because Sun Life has not argued otherwise, the Court assumes that Sun Life's annual policy anniversaries constitute a continuance within the meaning of Conn. Gen. Stat. § 38a-472k, and thus that its Policy falls under the ambit of the law. That interpretation stands harmonious with Sun Life's caselaw, modern Contract Clause doctrine, and Sun Life's status as a fiduciary. Thus, the Court will proceed to interpret how § 38a-472k affects the EWP.

### 2.     Section 38a-472k's Interpretation

The Court begins with the text of the law. Section 38a-472k states that:

> No insurer, health care center, fraternal benefit society, hospital service corporation, medical service corporation or other entity delivering, issuing for delivery, renewing, amending or continuing an individual or group health insurance policy in this state on or after January 1, 2020, providing [disability income protection coverage] shall include in such policy a provision reserving discretion to such insurer, center, society, corporation or entity to interpret the terms of such policy, or provide standards for the interpretation or review of such policy, that are inconsistent with the laws of this state.

Fuller asserts that Section 38a-472k constitutes a straightforward ban on insurance clauses that require deferential judicial review. Sun Life, for its part, insists that the "inconsistent with the laws of this state" qualifier must apply to all the restrictions that proceed it, even though such a reading would render the law nugatory. The Court finds that Fuller has the better of the argument.

### a.   Interpretive Principles

When a federal court construes state law, it treats as binding any precedent from a state's highest court. *Horace Mann Ins. Co. v. Gen. Star Nat. Ins. Co.*, 514 F.3d 327, 329 (4th Cir. 2008). And in the absence of such precedent, a district court must "predict" how the highest court of the state "would rule on th[e] issue." *Knibbs v. Momphard*, 30 F.4th 200, 213 (4th Cir. 2022). This prediction may be colored by decisions from "the state's intermediate appellate court," and by "restatements of the law, treatises, and well considered *dicta*." *Priv. Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002).

The Court begins its foray into § 38a-472k by outlining Connecticut's basic parameters of statutory interpretation. The "fundamental objective" of statutory construction "is to ascertain and give effect to the apparent intent of the legislature." *Alexson v. Foss*, 887 A.2d 872, 879 (Conn. 2006). The intent of the legislature can be gleaned in the first instance from its own interpretative mandates. Statutory interpretation begins with "the text of the statute itself and its relationship to other statutes." Conn. Gen. Stat. § 1-2z. Text must be "construed according to the commonly approved usage of the language" with "technical words and phrases . . . understood accordingly." Conn. Gen. Stat. § 1-1(a). Courts should strive to avoid an interpretation that would render a statutory provision "meaningless" or a "clause, sentence, or word . . . superfluous, void, or insignificant." *State v. Gibbs*, 758 A.2d 327, 343 (Conn. 2000) (internal citations and quotations omitted).

If the contextual meaning "is plain and unambiguous and does not yield absurd or unworkable results," then the interpretative enterprise ends where it begins: at the text. Conn. Gen. Stat. § 1-2z. A statute stands ambiguous when, "read in context, [it] is susceptible to more than one reasonable interpretation." *Carmel Hollow Assocs. Ltd. P'ship v. Town of Bethlehem*,

A.2d 451, 461 n.19 (Conn. 2004). When text alone yields ambiguity, a court may devise

meaning from "legislative history and the circumstances surrounding [] enactment, [] the

legislative policy [that the law] was designed to implement, and [] its relationship to existing

legislation and common law principles governing the same general subject matter." *Mickey v.*

*Mickey*, 974 A.2d 641, 651 (Conn. 2009) (internal quotations omitted).

### b.     The Text

Conn. Gen. Stat. § 38a-472k provides that:

> No insurer . . . providing [disability income protection coverage] shall include in such
> policy a provision reserving discretion to such insurer . . . to interpret the terms of such
> policy, or provide standards for the interpretation or review of such policy, that are
> inconsistent with the laws of this state.

The Court finds this language facially ambiguous. The statute contains two prohibitory clauses

followed by a limitation: No covered insurer may include a provision (i) reserving discretion

to itself to interpret the terms of its policy or (ii) providing standards for the interpretation or review

of the policy — the prohibitions — that are inconsistent with state law — the limitation. This

limitation could distribute to either the first, second or both preceding clauses. In other words,

the statute could be read as restricting insurers' discretion to (1) "include in [a] policy a provision

reserving discretion . . . to interpret the terms of such policy . . . that are inconsistent with" state

law or "provide standards for the interpretation or review of such policy"; (2) "include in [a]

policy a provision reserving discretion . . . to interpret the terms of such policy" or "provide

standards for the interpretation or review of such policy [] that are inconsistent with" state law;

or (3) "include in [a] policy a provision reserving discretion . . . to interpret the terms of such

policy . . . that are inconsistent with" state law or "provide standards for the interpretation or

review of such policy [] that are inconsistent with" state law. Put more succinctly, the statute

states no "A, or B, with C," which could be read as (1) no "A with C" or "B"; (2) no "A" or "B with C"; or (3) no "A with C" or "B with C."[13]

Ordinary rules of grammar would support distributing fully the "C," *i.e.*, that the "inconsistent with the laws of this state" qualifier modifies both of the proceeding clauses. When faced with similarly structured statutes, Connecticut courts employ the last antecedent rule, which "provides that qualifying phrases" — the "C" in our statute — "refer solely to the last antecedent in a sentence." *Conn. Ins. Guar. Ass'n v. Drown*, 101 A.3d 200, 216 (Conn. 2014) (citing 2A Singer & J. Singer, *Sutherland Statutory Construction* (7th ed. 2007) § 47:33). The last antecedent constitutes "the last word, phrase, or clause that can be made an antecedent without impairing the meaning of the sentence." 2A *Sutherland Statutory Construction* § 47:33 (7th ed.). In other words, the "C" limitation should ordinary be read to apply only to the "B" clause immediately preceding it. But "where a qualifying phrase is separated from several phrases preceding it by means of a comma, one may infer that the qualifying phrase is intended to apply to all its antecedents, not only the one immediately proceeding it." *State v. Rodriguez-Roman*, 3 A.3d 783, 791 & n.7 (Conn. 2010) (citing 2A *Sutherland Statutory Construction* § 47:33 (7th ed.)). So, the addition of the comma after the "B" supports reading the "C" qualifier back to the "A."

A simple example proves helpful in moving this discussion from the abstract to the concrete. If a circus announced that it has "a lion, an elephant, and two giraffes who perform on their hind legs," a fairgoer should purchase her ticket anticipating only the giraffes to walk erect. But if the announcement instead offered "a lion, an elephant, and two giraffes, who perform on

---

[13]     The Court finds the first of these three options to be the least semantically plausible and focuses its inquiry on choosing between the latter two.

their hind legs," the crowd would be rightly disappointed when the lion and elephant remained on all fours. The same result obtains here: the placement of a comma before the qualifier "inconsistent with state law" bolsters attachment of the qualifier to each clause preceding it.

The series qualifier canon points in the same direction. Under that principle, a modifier placed before or after a series of parallel terms ordinarily should read to apply to all items in a series. A. Scalia & B. Garner, *Reading Law: The Interpretation of Legal Texts* 147 (2012). The two preceding clauses parallel one another: both discuss ways by which an insurer might alter the background rules of contractual interpretation. An insurer may "reserv[e] discretion" to itself "to interpret the terms of" a policy, or it may "provide standards for the interpretation or review of" a policy. Conn. Gen. Stat. § 38a-472k. When a modifier "is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all." *Paroline v. United States*, 572 U.S. 434, 477 (2014) (quoting *Porto Rico Ry., Light & Power Co. v. Mor*, 253 U.S. 345, 348 (1920)). This principle constitutes the flip side of the last antecedent rule. But while these canons can sometimes point the reader in opposite directions, here they buttress the same result.

Both canons, however, are simply helpful heuristics regarding the ordinary operation of English grammar. They offer semantic defaults for how an ordinary person would typically read words. But these defaults are just that: defaults. Sometimes, context may indicate that these descriptive tools are a poor fit for a particular text. Such is the case here. Rote application of the canons yields a grammatically unworkable rule. Consider each clause with the qualifier applied:

No insurer . . . providing [disability income protection coverage] shall:

> (1) include in such policy a provision reserving discretion to such insurer . . . to interpret the terms of such policy that are inconsistent with the laws of this state or

> (2) provide standards for the interpretation or review of such policy, that are inconsistent with the laws of this state.

The qualifier fits the second clause like a glove and provides a cogent rule of application: no insurance clause may prescribe standards of interpretation or review of insurance policies in a manner inconsistent with state law. But the first clause is rendered inscrutable. The qualifier attaches to the "standards" in clause two and as a corollary should attach to the "provision" in clause one. But this furnishes a grammatical mismatch: the sentence begins with a singular but concludes with a plural. The "are" in the qualifier would need to be read as an "is" or "a provision" would need to read as "provisions." But if one attaches the qualifier only to the second clause, the statute clicks:

> No insurer . . . providing [disability income protection coverage] shall:
>
> > (1) include in such policy a provision reserving discretion to such insurer . . . to interpret the terms of such policy
>
> or
>
> > (2) provide standards for the interpretation or review of such policy, that are inconsistent with the laws of this state.

When read this way, both clauses are grammatically copacetic and perform a function independent of the other. Clause one compels *de novo* interpretation of contractual terms. Clause two prohibits any other contractual rules of interpretation or policy review that violate some other source of state law.

The facts of this case help to illustrate the distinction. Sun Life's Policy purports to require deferential judicial view of all "determinations of eligibility for benefits . . . and the amount of any benefits due," as well as deference to Sun Life's construction of "the terms of the Policy." (AR144–45). The former decisions would fall under clause two and abuse of discretion review would apply unless inconsistent with some other source of state law. The latter would fall under clause one and require *de novo* judicial review. Insofar as an award or denial of

29

benefits turns on the meaning of policy terms, the Court would review that decision *de novo*. *See Firestone*, 489 U.S. at 956 (distinguishing between discretion to "determine eligibility for benefits" and "construe the terms of the plan" while acknowledging that "the validity of a claim to benefits under an ERISA plan is likely to turn on the interpretation of terms in the plan.").

The Court believes that this construction — attaching the qualifier to only the clause abutting it — offers the most semantically sensible reading of the text. Sun Life's entire argument to the contrary hinges on the placement of a comma between the second clause and the qualifier. But while "punctuation . . . can be a useful tool for discerning legislative intent," it "is not generally considered an immutable aspect of a legislative enactment, given its unstable history." *Rodriguez-Roman*, 3 A.3d at 791 (internal citations omitted); *see Ewing's Lessee v. Burnet*, 36 U.S. (11 Pet.) 41, 52 (1837) (describing punctuation as "a most fallible standard by which to interpret a writing"). That practical guidance is particularly true here. Section 38a-472k was enacted as a small paragraph within a massive omnibus bill. *See An Act Concerning the State Budget for the Biennium Ending June 30, 2021, and Making Appropriations Therefor, and Provisions Related to Revenue and Other Items to Implement the State Budget*, Public Act. No. 19-117 § 244 (H.B. 7424) (nestling § 38a-472k in one paragraph 340 pages into a 580-page bill). It stands to reason that the legislators did not meticulously scrutinize every jot and tittle of a comma's placement.

### c.    Drafting History

Section 38a-472k was modeled on several earlier bills that suggest that the stray comma should not be overread. As early as 2013, the General Assembly introduced legislation targeted at discretionary clauses. *See An Act Concerning the Ins. Dep't's Auth. to Protect Consumers*, Conn. S.B. 1031 (2013). That bill's language mirrors § 38a-472k almost verbatim. It proposed:

> "No insurer . . . delivering, issuing for delivery, renewing, amending or continuing any individual or group health insurance policy or health care plan in this state shall offer, deliver or issue for delivery any such policy or plan that (1) includes any provision that reserves discretion to such insurer . . . to interpret the terms of such policy or plan, or (2) provides standards of interpretation or review that are inconsistent with the laws of this state.

*Id.* § 4. Under this version of the law, the "inconsistent with the laws of this state" language squarely attached to only the second clause. Senate Bill 1031 failed to clear both chambers of the legislature, but the cause was reanimated in 2019, during the legislative session that enacted § 38a-472k. In January 2019, State Senator Looney introduced "An Act Prohibiting Discretionary Clauses in Health Insurance and Disability Income Policies." Conn S.B. 41 (2019). That statute prohibited:

> [E]ach insurance company . . . that delivers, issues for delivery or renews an insurance policy in this state from including in such policy a clause that reserves discretion to such company . . . to interpret the terms of such policy in a manner that is, or to provide standards for the interpretation or review of such policy that are, inconsistent with the laws of this state.

*Id.* Under this version, the "inconsistent with laws of the state" qualifier now attached to both clauses. Like its erstwhile predecessor, this bill died in committee. But its absence was fleeting. Within a month, Senator Looney reemerged with Senate Bill 87, which parrots word for word the language that would become § 38a-472k:

> No insurer . . . delivering, issuing for delivery, renewing, amending, or continuing an individual or group health insurance policy in this state . . . shall include in such policy a provision reserving discretion to such insurer . . . to interpret the terms of such policy, or provide standards for the interpretation or review of such policy, that are inconsistent with the laws of this state.

Senate Bill 87 never advanced as standalone legislation, but in the House, its language was folded into the Public Act that became § 38a-472k.

As explained above, clause one of § 38a-472k breaks down when connected to the qualifier. Its legislative forebearers suggest that this grammatical mismatch sprung from a

redrafting of S.B. 41 to hew to the earlier language of S.B. 1031. Because § 38a-472k's most recent ancestor attached the qualifier to both clauses, it offers a modicum of support for Sun Life's reading of the final law. But the Court finds the contrary inference more persuasive.

Section 38a-472k's is built on S.B. 1031. They employ the same list of triggering verbs. They focus narrowly on "health insurance policy." They follow the same logical structure. By contrast, S.B. 41 omits policy amendments and continuances. It reaches any "insurance policy." It follows a different logical structure: prohibiting "each insurance company . . . from" rather than listing what "no insurer . . . shall" do. And, critically, S.B. 41 includes text to bridge the clause to the qualifier: "in a manner that is." Both S.B. 1031 and § 38a-472k, however, offer no link between the clause and qualifier. Thus, while the Court does not hinge its interpretation on the legislative dustbin, it finds that the drafting history modestly supports the Court's reading, not Sun Life's.

### d.      Legislative History & Policy[14]

Fuller objects to the Court's interpretation, but from the other direction. In his view, § 38a-472k voids discretionary clauses root and branch. That is, § 38a-472k bars any insurance clause that (1) reserves discretion to the insurer to interpret the terms of the policy or (2) provides standards for the interpretation or review of such policy. No other source of state law is necessary. As explained above, the Court agrees with Fuller as to the first clause but, as a matter of text, differs slightly as to the second. Nevertheless, because Connecticut courts

---

[14]      The Court reviews legislative history and policy, because it believes a Connecticut state court would do the same. *See State v. Courchesne*, 816 A.2d 562, 568, 576–78 (Conn. 2003) (explaining that "[f]or at least a century, th[e] [Connecticut Supreme Court] has relied on sources beyond the specific text of the statute at issue to determining [its] meaning" and that courts must therefore "consider . . . legislative history[,] the circumstances surrounding [] enactment, [and] the legislative policy [a law] was designed to implement").

32

consider all indicia of contextual enrichment, this Court considers Fuller's extrinsic evidence here.    .

The zeitgeist surrounding § 38a-472k suggests that the legislature — and the targeted industry — read § 38a-472k and its forebears as enacting the policy that Fuller suggests.  When S.B. 1031 was introduced in committee, a trade and lobbying association for the insurance industry warned that the proposed law "would prohibit the use of discretionary clauses, provisions that reserve discretionary authority to the insurer . . . to determine eligibility for benefits or coverage, and to interpret the terms of the policy."  *Public Hearing on Senate Bill 1031 Before the Conn. Ins. and Real Estate Committee* (May 7, 2013) (statement of Am.'s Health Ins. Plans) [https://perma.cc/SF4T-Q3SE].  Likewise, when S.B. 41 was introduced, the Insurance and Real Estate Committee heard testimony that the law would ban discretionary clauses and compel *de novo* judicial review in ERISA disputes.  *Statement on Senate Bill 41 Before the Conn. Ins. and Real Estate Committee* (Feb. 7, 2019) (statement of Eric George, President of the Ins. Ass'n of Conn.) [https://perma.cc/RP46-C254].  After this bill was swapped for S.B. 87, the Committee prepared a report extolling the bill's virtues:  it would "prohibit[] discretionary clauses in health insurance policies dealing with disability income" and join other states that "have made it illegal to enforce discretionary clauses."  *Joint Favorable Report on SB-87 of the Conn. Ins. and Real Estate Committee* (March 21, 2019) [https://perma.cc/Z34U-UNYT].  Recall, S.B. 87 houses the same text that ultimately became § 38a-472k.  The title of S.B. 87, "An Act Prohibiting Discretionary Clauses in Disability Income Insurance Policies," lends further credence to Fuller's view.

But none of these proposals crossed the line from bill to enacted law.  Indeed, the committee reports and industry testimony suggest that both actors were treating outcomes as

static even as the text remained in flux.  In other words, this history reveals at most expected applications, not linguistic meaning.  *See* Christopher R. Green, *Originalism and the Sense-Reference Distinction*, 50 St. Lous U. L. J. 555, 559 (2006) (distinguishing between "the meaning [] *expressed* by [] language . . . and the tangible outcomes *accomplished* by that language").  And the legislative history of § 38a-472k — the only Act to survive bicameralism and presentment — stands far more circumspect.  The Connecticut General Assembly's research office summarized the bill as prohibiting "provisions in disability income protection policies that allow insurers discretion to interpret the policy in a way that is inconsistent with state law." Office of Legislative Research Connecticut Bill Analysis, 2019 H.B. 7424 § 244 (June 2, 2019) [https://perma.cc/8278-F6AS].

Section 38a-472k's header reads "Discretionary clauses prohibited," lending further weight to the view that the statute was intended to bar all discretionary clauses of its own force. But "headings or titles of legislation are not conclusive," even though they may sometimes offer an "aid[] to construction and legislative intent."  *Conn. Light & Power Co. v. Overlook Park Health Care, Inc.*, 593 A.2d 505, 507 (Conn. App. Ct. 1991).  And § 38a-472k's header constitutes a particularly poor interpretative aid:  it was not part of the positive law enacted by the legislature but a post-codification addition.  *See* Public Act No. 19-117 § 244 (H.B. 7424) (omitting the header).

Nevertheless, with respect to "the circumstances surrounding [] enactment [and] the legislative policy [the law] was designed to implement," the Court believes that Fuller has the better of the argument.  *Mickey*, 974 A.2d at 651 (Conn. 2009).

### e.    Sister State Statutes

Fuller resists this conclusion by pointing to a constellation of laws from other states that have been read to prohibit all discretionary clauses. He claims that the Connecticut Supreme Court would "interpret [§ 38a-472k] just as every court in the country has interpreted similar statutes." (Pl. Supp. Resp. Br. (ECF No. 41) at 4). Here, the Court agrees.

In 2002, the National Association of Insurance Commissioners ("NIAC") promulgated "Model Act 42, entitled 'Prohibition on the Use of Discretionary Clauses Model Act,' which, as its name implies, urges states to adopt legislation that prohibits discretionary clauses in health insurance contracts." Joshua Foster, *ERISA, Trust Law, and the Appropriate Standard of Review: A De Novo Review of Why the Elimination of Discretionary Clauses Would Be an Abuse of Discretion*, 82 St. John's L. Rev. 735, 745 (2008). That model law has been adopted by several states almost verbatim, and it unmistakably served as the template for Connecticut's law. NAIC's Model Act directs that:

> No policy, contract, certificate or agreement offered or issued in this state for disability income protection coverage may contain a provision purporting to reserve discretion to the insurer to interpret the terms of the contract, or to provide standards of review that are inconsistent with the laws of this state.

NIAC Model Act § 4(B). To this Court's knowledge, not a single court has interpreted this language (or its slight state-level deviations) as enacting anything less than a blanket ban on discretionary clauses. *See, e.g.*, *Weisner v. Liberty Life Assurance Co. of Bos.*, 192 F. Supp. 3d 601, 613 (D. Md. 2016) (collecting cases). To be sure, most of these decisions reach their result in somewhat conclusory fashion. The most analogous precedent simply rejects the distinction between clause one and clause two altogether, reasoning that the distinction "between 'benefit

35

determinations' and 'contract interpretation'" constitutes an "artificial dichotomy." *Fontaine v. Metro. Life Ins. Co.*, 800 F.3d 883, 892 (7th Cir. 2015).[15]

This Court's task is to "predict" how Connecticut's highest court would decide this issue. *Knibbs*, 30 F.4th at 213. And this Court believes that the Connecticut Supreme Court would be reticent to break so sharply with unanimous authority. When confronted with an issue of first impression, the Connecticut Supreme Court "look[s] for guidance [from] other jurisdictions that have considered" a similar issue. *Weldy v. Northbrook Condo. Ass'n*, 904 A.2d 188, 194 (Conn. 2006). And when the legislature promulgates a law whose origins lie in the statute books of sister states, the Connecticut Supreme Court has presumed that the legislature intended to codify the same policy, even when there are slight linguistic deviations. *See Courchesne*, 816 A.2d at 576.

*Courchesne* offers a useful rescript for why Fuller's claim must prevail. In that seminal case, the Connecticut Supreme Court was asked to interpret the meaning of a statutory burden necessary for imposition of capital punishment. *Id.* at 564–65. The court noted that, "as a purely linguistic matter the defendant's contention" was the better reading, but that "context and history" divorced from the literal "language of the statute" supported an alternative interpretation. *Id.* at 569–70. That context and history was colored by laws "used in other

---

[15]     Fuller argues that binding Fourth Circuit precedent compels his reading of § 38a-472k. (Pl. Supp. Br. at 2–3 (citing *Shupe v. Hartford Life & Accident Ins. Co.*, 19 F.4th 697 (4th Cir. 2021))). The Court disagrees. In *Shupe*, the Fourth Circuited treated an Illinois derivative of the NIAC Model Act as requiring *de novo* review of all issues. *Id.* at 706. But the Fourth Circuit's interpretation of Illinois law would not control this Court's interpretation of Connecticut law. Nor would *Shupe* be particularly persuasive, as the Court must predict how the Connecticut Supreme Court — not the Fourth Circuit — would read § 38a-472k. Moreover, the parties in *Shupe* "stipulated" that any "discretionary authority is void under Illinois law," *id.*, and issues "neither briefed nor disputed" do not "constitute a holding" of the court. *United States v. Norman*, 935 F.3d 232, 240 (4th Cir. 2019).

states" and "certain proposed model statutes," which employed slightly different language. *Id.* at

575. But the Connecticut Supreme Court explained that even when the "legislature did not use

precisely the same language as that used or proposed for use by other legislative bodies to

address a similar situation . . . [it] does not require a conclusion that [the legislature] also

intended a different result, especially when . . . we can see no substantive difference between our

language and those other statutory formulations." *Id.* at 576. So too here.

The courts to have interpreted NIAC Model Act-derived statutes speak with a unified

voice, and it is unlikely that the Connecticut Supreme Court would tread new ground absent

compelling evidence pulling it in another direction. Although there are some textual grounds to

support such a swivel, Connecticut jurisprudence employs a totality-of-the-circumstances

approach to statutory interpretation. *See id.* at 579 (admonishing courts to be mindful that "the

legislative process is purposive, and the meaning of legislative language . . . is best understood

by viewing not only the language at issue, but by its context and by the purpose or purposes

behind its use") (quoting *Frillici v. Town of Westport*, 650 A.2d 557, 563 n.15 (Conn. 1994))

(internal alterations omitted). The uniform caselaw, coupled with the statutory history and

purpose, lead this Court to conclude that the Connecticut Supreme Court would treat § 38a-472k

as banning all discretionary clauses in covered plans.[16] Thus, this Court will review Fuller's

long-term disability claims *de novo*.

---

[16]    The Court does not address Fuller's separate argument that Connecticut common law
constitutes "the laws of th[e] state" or that this common law stands "inconsistent" with
discretionary clauses in disability income insurance contracts. It suffices to acknowledge that the
Connecticut Supreme Court would likely adopt Fuller's interpretation of the statute without
deciding the precise means that court would use to get there.

**B.      The Merits**

Fuller ascribes three errors to Sun Life's denial of his LTD benefits:  first, that Sun Life conducted an inadequate investigation of his condition; second, that Sun Life ignored evidence that would support his claim; and third, Sun Life's vocational reports failed to identify any gainful occupation that Fuller could fill.  The Court addresses each in turn.  In short, the Court finds that (i) Sun Life's medical examiners are credible notwithstanding Fuller's arguments; (ii) Fuller failed to carry his evidentiary burden of proving that he satisfies his Policy's definition of disabled; and (iii) that the occupations that Sun Life identified satisfy the Policy's definition of gainful employment.

**1.       Sun Life's Evidentiary Considerations**

Fuller contends that Sun Life blindly "adopted the opinions of its paid reviewers" without addressing competing medical evidence.  (Pl. Br. (ECF No. 29) at 15).  This rubber stamp, in Fuller's telling, rendered Sun Life's disposition rife with procedural and substantive flaws.  He is wrong on both counts.

**a.       Fuller's Procedural Objections**

Procedurally, Fuller argues that Sun Life's adjudication was deficient, because it "lacked procedures for weighing [] evidence."  (*Id.*)  This charge rests on pure speculation:  because Sun Life allegedly failed to inform Fuller of its internal procedures, he "assumes it has no such procedures." (*Id.*)  That is wrong twice over.

*First*, Fuller's claims of subjective ignorance of Sun Life's procedures are belied by the record.  Eight months before Fuller triggered Sun Life's tapered disability definition, Sun Life wrote Fuller to explain how it would decide his ongoing eligibility for LTD benefits.  (AR218–19).  In its September 12, 2022 denial of LTD benefits, Sun Life explained the terms of its

38

policy, the evidence that it considered and why that evidence did not support a finding of ongoing disability. (AR396–400). The letter specified which "internal claim-handling guidelines" Sun Life relied on and offered to provide copies of those guidelines to Fuller. (AR399). When Fuller later requested these guidelines, they were promptly delivered. (AR646–47, AR651–94).

*Second*, the record cogently features Sun Life's implementation of these procedures. Sun Life gave Fuller advanced notice of its change in policy, informed him of the information necessary to maintain eligibility and provided him with a meaningful opportunity to adduce evidence in his favor. (AR218–19). Sun Life identified new occupations harmonious with Fuller's physical limitations and updated those findings based on new medical evidence. (AR245–48, AR1201–02). When Sun Life rendered an initial unfavorable decision, it provided Fuller with ample recourse. And after that decision, Sun Life was far from obstinate; Fuller's itinerate file was assessed and reassessed to address his evolving arguments. Nothing in the record suggests "arbitrary or unprincipled decisionmaking," *Gagliano v. Reliance Standard Life Ins. Co.*, 547 F.3d 230, 235 (4th Cir. 2008), or a refusal to engage in "meaningful dialogue." *Harrison v. Wells Fargo Bank, N.A.*, 773 F.3d 15, 22 (4th Cir. 2014). Indeed, although Fuller asserts that Sun Life's decision-making was opaque and unprincipled, the only concrete evidence that he musters constitutes Sun Life's failure to engage adequately with his letter of August 30, 2023. (Pl. Br. at 22 (citing AR557–65)). But Fuller was provided with an adequate opportunity to resolve the question that he raised in the year leading up to his final denial. The Court does not find that Sun Life's response to Fuller's letter renders its adjudication procedurally defunct.

Sun Life was transparent from the outset about the criteria that it employed. At each step in the process, Sun Life offered Fuller an opportunity to produce favorable evidence and to

39

contest Sun Life's findings. (*See, e.g.*, AR600 (informing Fuller of Dr. Green's findings and allowing comments or supporting documentation to contest the report)). Sun Life twice contacted Fuller to inquire as to his condition (AR210–12, AR322–24), and twice commissioned fresh reviews of his record after Fuller raised new proof of his inability to work. (AR406–11, AR545–550). At bottom, Fuller's procedural objections amount to a charge that because Sun Life failed to credit his narrative, it must have abdicated its responsibility to weigh the evidence altogether. The Court cannot endorse that logical leap.

### b.    Fuller's Substantive Objections

Substantively, Fuller argues that Sun Life's medical reviews were "fundamentally flawed" and "ignored Mr. Fuller's treating providers." (Pl. Br. at 16, 18). His argument works like this. Fuller focuses on minor discrepancies in Sun Life's medical reports to discount the fruits of Sun Life's investigation. He then fixates on two pairs of checked boxes from Dr. Ramesh's July 12 Statement that ostensibly support Fuller's inability to work. But four checked boxes spread across a single page cannot trump voluminous contrary evidence that cuts against a finding of total disability. Nor can the Court avert its gaze from Dr. Ramesh's repeated findings cutting against Fuller's total disability.

Fuller asks the Court to discount each of Sun Life's medical reports because, in his view, they inadequately grapple with Dr. Ramesh's July 12 Statement. Dr. Barreto reviewed that Statement but mistakenly quoted Dr. Ramesh as finding that Fuller "can sit about 2 hours at a time" (AR386), when Dr. Ramesh marked that Fuller could sit for 1 hour at a time or 2 hours in an eight-hour day. (AR346). But the very sentence preceding that errant comment explains that Fuller "is not able to sit more than . . . one hour at a time." (AR386). And Dr. Barreto otherwise fully captures Dr. Ramesh's findings, including Fuller's diagnoses, treatment and ongoing

40

physical limitations. (AR386–90).  One misquoted line — immediately preceded by the correct statement — does not invalidate the fastidiousness of Dr. Barreto's findings, nor does it infect the derivative products of those findings:  Sun Life's Transferrable Skills Analysis and initial benefits denial.

Fuller next claims that Dr. Green's findings are self-contradictory and "cho[o]se to . . . ignore" the July 12 Statement.  (Pl. Br. at 17).  But Dr. Green plainly considered the Statement, and Fuller's manufactured conflict is illusory.  Dr. Green's report states and summarizes the July 12 Statement as among the evidence that he considered in rendering his opinion.  (AR408). True, he does not go on to harmonize that Statement with his opinion after reviewing the record. But a decisionmaker "can consider all the evidence without directly addressing in his written decision every piece of evidence," and "the fact that the [] opinion failed to discuss all of the . . . evidence . . . does not mean that [Dr. Green] 'failed to consider' the evidence."  *Loral Def. Sys.- Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999) (quoting *NLRB v. Beverly Enter.-Mass.*, 174 F.3d 13, 26 (1st Cir. 1999)); *accord Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014).[17]  Nor are there any contradictions in Dr. Green's opinion.  He states that he "agree[s] with Dr. Ramesh" and that, as of August 12, 2022, Fuller was "[]capable of performing full-time sedentary work."  (AR409–10).  In this respect, he agreed with Dr. Ramesh's previous conclusions to the same effect.  (AR307–10, AR331–334).  It is of no occasion that Dr. Green did not enumerate why his (and Dr. Ramesh's) bottom line conclusions were harmonious with the July 12 Statement.

---

[17]    Although these cases apply substantial evidence review, the principle that they articulate applies with equal force to this Court's *de novo* review of Dr. Green's report.

Fuller's dismissals of Dr. Nava fail for much the same reason.  Although Dr. Nava's report does not discuss the July 12 Statement, it was not required to.  Importantly, Dr. Nava did consider and discuss updates from Dr. Ramesh *after* July 12.  (*See* AR545–46 (summarizing Dr. Ramesh's findings from July 27, October 6, October 7, and October 11, 2022)).  These updates aligned with Dr. Nava's own medical judgment.  As he did with Dr. Barreto, Fuller latches onto a misquoted line in Dr. Nava's opinion, but a simple misquote provides no basis to jettison the professional opinion of a physician.

In sum, the Court finds that the errors that Fuller ascribes to Drs. Barreto, Green and Nava's reports do not undermine the credibility of their bottom-line conclusions:  that Fuller could work in a sedentary occupation.  Because Fuller offers no other reason to discount their conclusions, the Court finds on an independent review of the record that their findings are credible and persuasive.

### 2.      Fuller's Supporting Evidence

Fuller presents no affirmative evidence that he cannot perform a full-time sedentary job. Fuller's chief evidence for his disability consists of Dr. Ramesh's July 12 Statement.  That Statement consists of a standard form designed to assess how a patient would perform in a competitive work environment.  (AR345–48).  One of the form's questions asks how long a patient can sit or stand at one time and over an eight-hour workday and provides a series of pre-defined answers.  (AR346).  Dr. Ramesh marked that Fuller could stand for five minutes and sit for one hour continuously, and stand for less than two hours and sit for about two hours over a standard workday.  (*Id.*)  Fuller argues that this "clearly show[s] that he would be incapable of sedentary work."  (Pl. Br. at 19).  The Court disagrees.  So too does Dr. Ramesh, who thrice concluded that Fuller could return to work if his physical activity was limited.  (AR308–10,

42

AR311, AR331–334). The last of these opinions was rendered on July 8, 2022, just four days before Dr. Ramesh's July 12 Statement. (AR334). Nowhere in that Statement does Dr. Ramesh opine that Fuller's physical handicaps preclude his ability to work. Nor does Fuller suggest that his condition so rapidly deteriorated over a four-day period that Dr. Ramesh changed his mind on July 12. It appears instead that Dr. Ramesh saw no tension between his opinions, which is to say, Dr. Ramesh believed that Fuller could work notwithstanding his limited mobility. And if Fuller believed that Dr. Ramesh felt otherwise, he had every opportunity to ask Dr. Ramesh to render an opinion to that effect. Dr. Ramesh's subsequent silence is deafening.

The Functional Capacity Evaluation does not tip the scales back in Fuller's favor. The June 28, 2023 FCE was conducted by physical therapists who observed Fuller over four hours to "determine his ability to safely return to work." (AR443). They determined that Fuller could sit and stand for less than two hours each across an eight-hour workday. (AR455). A corresponding form from one of the evaluators adds that Fuller would "have difficultly" with sedentary, full-time work. (AR457). Sun Life discounts these findings, because of feigned issues with the timeline: the FCE (i) misdates the inception of Fuller's injury (*see* AR443 (stating that Fuller's injuries commenced in May 2023 rather than May 2020)) and (ii) reveals "Fuller's functional capacity on June 28, 2023," which does "not reference or relate back to his physical condition as it existed on August 12, 2022." (Def's Opp. at 4).

Sun Life's first objection is frivolous, and the Court will not lend it any credence. As to the second, although the FCE stands far from dispositive, it does offer at least some supporting evidence of Fuller's earlier condition. Nevertheless, the Court agrees that Sun Life has the better of the argument. The FCE was conducted nearly a year after Sun Life was required to render a decision. The evaluators stated that Fuller's physical limitations would render work "difficult,"

not infeasible. (AR457). And the overwhelming weight of the evidence cuts against this Court reaching a different bottom-line conclusion based on this lone evaluation.

Fuller's only other evidence suffers from even more glaring issues of reliability and propriety. Attached to Fuller's summary judgment brief is an ALJ's favorable adjudication of Fuller's claim for Social Security Disability Insurance ("SSDI") benefits, dated January 8, 2024. (SSDI Determination (ECF No. 29-1)). This Determination was not before Sun Life when it denied Fuller's benefits and does not form part of the administrative record. Extrinsic evidence "not presented to the administrator" may only be considered "when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision." *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1025 (4th Cir. 1993) (*en banc*). Although the decision to entertain such evidence rests in the district court's discretion, a court must exercise "significant restraint[]" before doing so. *Id.* The Fourth Circuit has cataloged a non-exhaustive list of factors that may present exceptional circumstances, including, as relevant here, "circumstances in which there is additional evidence that the claimant could not have presented in the administrative process." *Id.* at 1027.

But while this factor cut in Fuller's favor, the *en banc* court also cited favorably to an Eighth Circuit decision that upheld a district court's refusal to consider new evidence when the administrator "reviewed the denial of long-term disability benefits at least three times, there was an extensive record including five doctors' reports, and the sole issue before the court was whether [the claimant] was able to engage in any gainful employment." *Id.* at 1026 (citing *Davidson v. Prudential Ins. Co. of Am.*, 953 F.2d 1093, 1094–95 (8th Cir. 1992)). That describes these facts to a tee. Nevertheless, *Davidson* only held that the refusal to consider new evidence was not an abuse of discretion, not that such refusal was required. Because Fuller could not have

44

presented his SSDI Determination to Sun Life at an earlier stage, and because that Determination does not alter this Court's bottom-line conclusion, the Court will consider Fuller's extra-record evidence to explain why it does not support reaching a different judgment.

Fuller argues that the Social Security Administration ("SSA") employs "a much higher standard" of disability than "the policy at issue here." (Pl. Br. at 8); *compare* 20 C.F.R. § 404.1505 (defining disability "as the inability to do any substantial gainful activity") *with* (AR122–25 (defining total disability as the inability to fulfill a gainful occupation that would provide at least 60% or more of pre-disability earnings)). Thus, because Fuller was found disabled by an SSA ALJ, he asserts that the corollary must be that he is disabled under the Policy. That reasoning falls flat.

First, as with the FCE, the SSDI Determination reflects Fuller's condition as it stood well over a year after Sun Life's decision. Second, Fuller's spinal impairment was one of a myriad of disabilities that the ALJ considered and credited in reaching his decision. (*See* SSDI Determination at 5 ¶ 3 (identifying alcoholism, a malignant neoplasm, osteoarthrosis, obesity, and depression among Fuller's qualifying disabilities)). Third, the ALJ made numerous findings that cut against Fuller's position throughout this litigation. The Decision held that Fuller "has the residual functional capacity to perform sedentary work" if provided with a "sit/stand option." (*Id.* at 5 ¶ 5). The ALJ deemed Dr. Ramesh "minimally persuasive" and — like this Court — read Dr. Ramesh as believing that Fuller could fulfill "a desk job that does not require significant walking or standing." (*Id.* at 8–9). The ALJ hinged his ruling not on Fuller's physical incapacity to work, but on the dearth of jobs in the national economy commensurate with Fuller's age, education, work experience and residual functional capacity. (*Id.* at 10 ¶ 10). Fuller can either have the Court credit the ALJ — with his findings that Fuller can work and that

45

Dr. Ramesh believes the same — or not. He cannot pick and choose favorable pieces of evidence to build a new, chimeric record supporting claim for benefits. Any one of the foregoing deficiencies with the SSDI Determination would suffice to disregard Fuller's supplemental evidence. Combined, they prove fatal.

In sum, Fuller points to only three pieces of supporting evidence: Dr. Ramesh's July 12 Statement, the FCE and the SSDI Determination. The Court finds that Dr. Ramesh and the SSDI Determination both evince Fuller's capacity to work a full-time, sedentary job. And the FCE, standing alone, cannot refute the five physicians who reviewed Fuller's file and reached the same conclusion. [18]

### 3. Fuller's Indexed Earnings

Finally, Fuller argues that Sun Life misconstrued and misapplied the Policy's criteria for a long-term disability, and therefore wrongfully concluded that jobs existed that Fuller could perform. Recall, after 24 months of benefits, an employee qualifies as totally disabled if he cannot "perform with reasonably continuity any Gainful Occupation for which he is or becomes reasonably qualified." (AR124–25). A Gainful Occupation constitutes employment that offers

---

[18]     At least seven doctors handled Fuller's treatment or independently reviewed his record: (i) Dr. Deeni Bassam, who treated Fuller's collapsed vertebrae from May 13, 2020 to June 30, 2022; (ii) Dr. Arjun Ramesh, Fuller's primary treating physician after his diagnosed lumbar radiculopathy; (iii) Dr. Scott Strum, who conducted the April 2021 medical review of Fuller's file; (iv) Dr. William Barreto, who conducted an independent peer review on August 26, 2022; (v) Dr. Arlen Green, who conducted a second independent peer review on April 18, 2023; (vi) Dr. Andrew Nava, who conducted a third independent peer review on August 16, 2023; and (vii) Dr. Brittany Daley, one of the two evaluators of Fuller's FCE. Dr. Bassam stated that Fuller could sustain a consistent level of activity with various restrictions but did not definitively speak to Fuller's ability to work; of the remaining six, only Dr. Daley offered evidence supporting Fuller's position. And she constitutes the only one of these six medical professionals who did not conclusively opine on whether Fuller could return to work — she simply recorded his capacity to perform various physical tasks.

an employee "income of at least 60% of his Indexed Total Monthly Earnings." (AR122). And

Indexed Total Monthly Earnings are defined as:

> the Employee's Total Monthly Earnings prior to the date his Total or Partial Disability
> began adjusted on the first of the month following 12 calendar months of Partial
> Disability Benefit payments and each annual anniversary thereafter. Each adjustment to
> the Indexed Total Monthly Earnings is the lesser of 10% or the current annual percentage
> increase in the Consumer Price Index.

(AR123). Fuller's Total Monthly Earnings before his lumbar injury were $5,546.67 per month.

(AR173). According to Fuller, Sun Life was required to twice adjust that figure for inflation,

which would yield an Indexed Total Monthly Earning of $6,711.47. (Pl. Br. at 7, 23). To

qualify as a Gainful Occupation, then, a position would need to offer 60% of this adjusted figure,

*i.e.*, $4,026.88 per month, or $23.23 per hour. (*Id.* at 7–8). But Sun Life instead took 60% of

Fuller's unindexed Total Monthly Earnings and calculated his gainful wage at $3,328.00 per

month or $19.40 per hour.[19]

In each of its TSAs, Sun Life identified occupations that paid $19.40 per hour but not

$23.23 per hour. (AR248, AR395). As Sun Life notes, however, the Policy only "adjust[s]" an

"Employee's Total Monthly Earnings" after "12 calendar months of *Partial* Disability Benefit

payments." (AR123 (emphasis added)). Because Fuller never received partial disability

benefits, no adjustment was required.

Fuller has two responses. First, he argues that this reference to partial disability

constitutes a "clerical error," because other Sun Life policies offering wage indexing do not treat

partially and fully disabled claimants differently. (Pl. Reply Br. (ECF No. 36) at 6 (citing *Helm*

---

[19]   The portion of the record that Fuller cites lists his gainful wage at $19.20 per hour. (*Id.*
(citing AR173)). In its Transferable Skills Analysis, however, Sun Life relies on a gainful wage
of $19.40/hour. (AR245). Because nothing turns on this twenty-cent difference, the Court uses
the more charitable of these two calculations.

*v. Sun Life Assurance Co. of Can.*, 624 F. Supp. 2d 1034, 1037 (W.D. Ark. 2008)). The Court

notes at the outset that the terms that Sun Life chooses to employ in other policies do not control

the meaning of the terms that it bargained for here. But even if they could, the case that Fuller

cites conveys precisely the opposite of what he claims. The *Helm* court recounts the terms of

that Sun Life policy as incorporating the precise definition of Total Disability and Gainful

Occupation that Sun Life uses here. 624 F. Supp. 2d at 1037. It does not recite the definition of

Indexed Total Monthly Earnings. The plaintiff's brief in *Helm*, however, states that the plan

there defined "Indexed Total Monthly Earnings as the participant's 'Total Monthly Earnings

prior to the date his Total or Partial Disability began adjusted on the first month following 12

calendar months of *Partial* Disability Benefit payments and each annual anniversary thereafter.'"

Brief for Plaintiff at 3, *Helm v. Sun Life Assurance Co. of Can.*, 624 F. Supp. 2d 1034 (W.D.

Ark. 2008) (No. 2:07cv2112), 2008 WL 7155815. Thus, even if the Court were inclined to

venture beyond the four corners of the Plan, it would find only consistency in Sun Life's

policies.

Fuller next argues that this definition of income violates ERISA, because it "treats

similarly-situated claimants" differently. (Pl. Reply Br. at 7). Several courts have held, in the

class certification context, that ERISA's fiduciary duties bar "discriminat[ion] between similarly

situated beneficiaries." *Clemons v. Norton Healthcare Inc. Ret. Plan*, 890 F.3d 254, 280 (6th

Cir. 2018); *see Adams v. Anheuser-Busch Cos., Inc.*, 2012 WL 1058961, at *10 (S.D. Ohio Mar.

28, 2012) (collecting cases). But that proposition does not require Fuller's conclusion. Partially

and totally disabled claimants are not similarly situated. Partially disabled employees can work

and earn up to 80% of their pre-disability income while receiving benefits. (AR124, AR130).

Totally disabled employees, by contrast, either cannot work or, if they do, earn only up to 20%

of their total monthly earnings. (AR124, AR129). At the end of twenty-four months, both categories of claimants must be unable to perform any gainful occupation, rather than their own occupation. (*Id.*) But for partially disabled claimants, they must surmount an additional barrier: they cannot have outside earnings equal to or greater than 60% of their Indexed Total Monthly Earnings. (*Id.*) Because partially disabled claimants are subject to an outside-income cap that totally disabled claimants are not, they receive the benefit of adjusting their pre-disability income to raise the threshold for that cap. Nothing in ERISA requires Sun Life to apply the same income formula to these disparate categories of claimants.

### C.    Attorney's Fees & Costs

Both parties ask the Court to award attorney's fees and costs should they prevail. (Pl. Br. at 24–25); (Def.'s Br. (ECF No. 27) at 19–20). Section 502 of ERISA allows a court "in its discretion" to award "a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). Five factors guide that discretion: (1) the degree of the opposing party's culpability or bad faith; (2) the ability of the opposing party to satisfy an award of attorney's fees; (3) whether an award of attorney's fees would deter other persons acting under similar circumstances; (4) whether the party requesting attorney's fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' positions. *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1029 (4th Cir. 1993) (*en banc*). Even if a party does not constitute the prevailing party, it may obtain fees and costs so long as it achieved "some degree of success on the merits." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 244 (2010); *id.* at 255 n.8 (noting that the Fourth Circuit's five factors may permissibly apply after the "some degree of success" standard stands satisfied).

The *Quesinberry* factors do not support an award of fees or costs to either party. Neither litigant engaged in bad faith in contesting Fuller's disability award. There exists no reason to disincentivize similarly situated parties from pursuing claims under analogous circumstances. Neither party sought to benefit all plan participants, and although the parties raised a novel issue of Connecticut state law, that law is of a piece with many similarly drafted statutes. Finally, both parties raised meritorious claims, even if their arguments did not ultimately prevail.

## IV.   FINDINGS OF FACT & CONCLUSIONS OF LAW

After a bench trial, the Court "must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). Accordingly, the Court now summarizes and restates its findings of fact and conclusions of law.

### A.   Findings of Fact

1.     Fuller suffered an acute lumbar injury on May 5, 2020. That injury rendered him unable to perform the Material and Substantial Duties of his Own Occupation.

2.     Because Fuller satisfied his Policy's definition for Totally Disabled, he was eligible for disability benefits for a period of twenty-four months. Sun Life properly disbursed these benefits from August 12, 2020, to August 12, 2022.

3.     After August 12, 2022, Fuller was required to prove that he was unable to perform with reasonable continuity any Gainful Occupation.

4.     Although Fuller is afflicted with ongoing pain and physical limitations from his spinal trauma, those conditions are not so austere as to preclude his ability to work a sedentary job.

5.     Sun Life identified three occupations that would offer Fuller gainful employment commensurate with his wage, experience and physical handicaps.

6.      Every independent medical examiner commissioned by Sun Life concluded that Fuller could return to work in a sedentary occupation.  These examiners considered adequately the totality of Fuller's records.

7.      Dr. Arjun Ramesh, Fuller's primary treating physician, also opined that Fuller could return to work in a sedentary occupation.  Dr. Ramesh's July 12 demarcations do not support a contrary reading of his views.

8.      Fuller's Functional Capacity Evaluation does not preclude his ability to work a sedentary occupation.

9.      A Social Security Administration Administrative Law Judge concluded that Fuller could work a sedentary job if provided with a "sit/stand" option.

10.     The totality of the evidence supports Fuller's ability to work in a sedentary occupation.

## B.    Conclusions of Law

1.      Because the parties raised genuine disputes of material fact, disposition of this matter occurs following a Rule 52 bench trial.

2.      The long-term disability plan contains a discretionary clause that would ordinarily require abuse of discretion review.

3.      Connecticut General Statute § 38a-472k would be interpreted by the Connecticut Supreme Court to bar discretionary clauses in disability income protection plans and require *de novo* judicial review.

4.      Section 38a-472k applies to Sun Life's policy, because that Policy was continued after January 1, 2020.

5.      Application of § 38a-472k to the Policy does not violate the Contract Clause.

51

6. Sun Life provides adequate explanations and disclosures as required by 29 C.F.R. § 2560-503.1

7. The Policy did not require Sun Life to adjust Fuller's Total Monthly Earnings for inflation.

8. Fuller did not satisfy his Policy's definition of disabled after August 12, 2022, because the evidence shows that he could fill a Gainful Occupation.

9. Neither party stands entitled to attorney's fees or costs.

*     *     *

Fuller's Motion for Judgment on the Record (ECF No. 28) will be DENIED and Sun Life's Motion for Summary Judgment (ECF No. 26) will be converted into a motion for Judgment on the Record and GRANTED. Judgment will be entered for Sun Life and against Fuller.

An appropriate order shall issue.

Let the Clerk file a copy of this Memorandum Opinion and notify all counsel of record.

It is so ORDERED.

_____/s/_____

David J. Novak
United States District Judge

Richmond, Virginia
Date: September 6, 2024